IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JUDITH TRACKWELL,                    )
                                     )
              Plaintiff,             )    4:05 CV 3171
                                     )
       v.                            )
                                     )
                                     )
B & J PARTNERSHIP, LTD., CLAY F.     )    MEMORANDUM AND ORDER
SMITH, WILLIAM D. SMITH, A. JOYCE    )
SMITH, HOME SERVICES OF              )
NEBRASKA, INC., and CAPITOL          )
TITLE COMPANY,                       )         SEALED
                                     )
              Defendants.            )


INTRODUCTION

       Pending before the court are defendants' motion to
disqualify Mary Wickenkamp ("Wickenkamp") as counsel for the
plaintiff and request for sanctions, filing 43; and defendants'
sealed motion for leave to provide the sealed motions, briefs,
and evidence in this case to the Counsel for Discipline of the
Nebraska Supreme Court, filing 76.  The case was stayed pending a
decision on the motion to disqualify.  Filing 64.  Voluminous
evidence and briefs have been filed in relation to the motion to
disqualify, much of it under seal.

       The defendants' motion for leave to release sealed court
documents for submission to the Counsel for Discipline, filing
76, is uncontested.  Wickenkamp urges the court to grant the
motion "so that Counsel may seek a final resolution of
[defendants'] allegations."  Filing 77.  I shall therefore grant
defendants' motion for leave to release documents filed under
seal in this case for the sole purpose of providing such
documents to the Counsel for Discipline.

After the defendants filed their motion to disqualify Wickenkamp as counsel, she requested and was given leave to withdraw.  Filing 73.  Thus, the portion of the defendants' filing 43 motion seeking to disqualify Wickenkamp is moot.  Filing 73.  However, to the extent the defendants' motion to disqualify requests sanctions, the motion will be granted.

## SCOPE OF FACTUAL REVIEW

Contrary to Wickenkamp's arguments, the defendants' request for sanctions was not rendered moot when Wickenkamp withdrew from this case.  "The purpose of sanctions goes beyond reimbursing parties for expenses incurred in responding to unjustified or vexatious claims.  Rather, sanctions are 'designed to punish a party who has already violated the court's rules.'"  Perkins v. General Motors Corp., 965 F.2d 597, 599 (8th Cir. 1992)(quoting Willy v. Coastal Corp., 503 U.S. 131, 139 (1992)).  A party, either unilaterally or by agreement with opposing counsel, cannot undermine the court's authority to impose sanctions for past abuses of court processes.  Cooter & Gell v. Hartmarx Corp., 496 U.S. 384 (1990)(holding that plaintiff's voluntary dismissal of the lawsuit did not divest the court of jurisdiction to impose Rule 11 sanctions); Perkins, 965 F.2d at 600 ("Appellants are entitled to bargain with adversaries to drop a motion for sanctions, but they cannot unilaterally bargain away the court's discretion in imposing sanctions and the public's interest in ensuring compliance with the rules of procedure.").  Additionally, given the pattern of litigation involving these parties' relationships, it is quite possible that unless the court intervenes and addresses Wickenkamp's actions, they may recur in another case.

2

The evidence submitted on defendants' request for sanctions focuses on a series of acts performed by Wickenkamp, not by Judith Trackwell herself. Therefore, I find that any sanctions awarded should be paid by Wickenkamp and not the plaintiff. I have further limited my review to the specific sanction requested in the defendants' motion--their expenses and attorney fees incurred in filing the motion to disqualify and bringing this matter before the court.[1]

The defendants' evidence in support of sanctions depicts a complex web of communications, lawsuits, filings, and questionable acts by Wickenkamp. This evidence consists of several affidavits, copies of correspondence and documents exchanged between Wickenkamp and the defendants or their counsel, and records of the District Court of Lancaster County, Nebraska. The Lancaster County District Court records include those related to a civil condemnation appeal involving a portion of the Trackwell land located at Southwest 27th and West A streets in Lancaster County, Nebraska, and a criminal suit against Lloyd Trackwell Jr. concerning the sale of Trackwell property located at 8301 West Van Dorn Street in Lancaster County, Nebraska. In addition to the evidence filed of record in this case, the defendants ask the court to take judicial notice of six other lawsuits filed in this court by Wickenkamp on behalf of Judith Trackwell and/or her family members. Defendants argue that the

---

[1]Upon a finding of bad faith, the court has inherent authority to not only impose a compensatory award of costs and attorney fees incurred as a result of bad faith conduct, but also an additional punitive amount, payable to the court, to deter future misconduct. <u>Plaintiffs' Baycol Steering Committee v. Bayer Corp</u>., 419 F.3d 794, 808 (8th Cir. 2005). Under the totality of circumstances pending, I have chosen not consider awarding further punitive sanctions against Wickenkamp in this case.

totality of this evidence supports a finding that Wickenkamp has
engaged in unethical behavior and had acted in bad faith to
harass the defendants, their lawyers, and others.

Wickenkamp's response acknowledges no wrongdoing on her
part, accuses the defendants of taking acts out of context or
misrepresenting facts, challenges several of the factual
underpinnings of the defendants' motion, and argues that all her
actions were taken in good faith.   Filing 74 (plaintiff's brief)
at p. 3; filing 57, ex. 1 (Wickenkamp affidavit).   Some of
Wickenkamp's responses, however, do not deny the allegations, but
rather attempt to explain her conduct.

"[B]efore a district court may impose sanctions, the
individual must receive notice that sanctions against her are
being considered and an opportunity to be heard." Plaintiffs'
Baycol Steering Comm. v. Bayer Corp., 419 F.3d 794, 802 (8th Cir.
2005)(citing In re Clark, 223 F.3d 859, 864 (8th Cir. 2000)
(citing Chambers v. NASCO, Inc., 501 U.S. 32, 56-57 (1991)); and
Jensen v. Fed. Land Bank of Omaha, 882 F.2d 340, 341 (8th Cir.
1989)).   However, "[a]n opportunity to be heard does not require
an oral or evidentiary hearing on the issue; the opportunity to
fully brief the issue is sufficient to satisfy due process
requirements." Resolution Trust Corp. v. Dabney, 73 F.3d 262,
268 (10th Cir. 1995).   See also Pacific Harbor Capital, Inc. v.
Carnival Air Lines, Inc., 210 F3d 1112, 1118 (9th Cir. 2000).

The issue currently before me is whether Wickenkamp's
conduct was sanctionable and justifies awarding the defendants
their costs and attorney fees in filing a motion to disqualify.
The parties have fully briefed this issue, and Wickenkamp has
been afforded an opportunity to submit evidence and arguments in

4

response.   Absent any need to resolve material issues of fact raised by the parties' submissions, due process does not require an evidentiary hearing on defendants' request for sanctions. After thoroughly reviewing the evidence submitted by the parties, I conclude that while some facts may be in dispute, the undisputed material facts support this court's determination that sanctions are warranted and as such, an evidentiary hearing is not required.[2]   In addition, no evidentiary hearing was

---

[2]The record is replete with allegations that Lloyd Trackwell Jr. made several contacts with Strotman, B&J representatives, and employees of the HomeServices/Capitol Title defendants, most of which were harassing or coercive in nature.  For example, with Wickenkamp's knowledge and permission, Lloyd Trackwell Jr., as the "authorized representative" of Judith Trackwell, appeared at the Cline, Williams law firm on August 1, 2005 to speak with Strotman about the Trackwell/B&J dispute.  Despite Strotman's refusal to speak with Trackwell that day, and Strotman's request that Wickenkamp instruct Trackwell to not attempt to speak with Strotman or B&J representatives thereafter, Lloyd Trackwell Jr.'s contacts persisted.  See e.g. Filing 45-2, ex. 1 (Tavlin declaration), ¶ 20; filing 45-3, ex. 4 (Strotman declaration), ¶¶ 4, 7, 9, 13, and exs. B, C, D, H, I, J & L.  See also filing 45-5, ex. 7 (Lamphere affidavit), ¶¶ 9-10; filing 45-5, ex. 9 (LaDuke affidavit), ¶¶ 7-8.  On the record before me, there is no evidence that Wickenkamp authorized, encouraged, or condoned Lloyd Trackwell Jr.'s allegedly harassing conduct.  Although he was Judith Trackwell's "representative," I cannot discern from this record whether his allegedly harassing conduct was beyond the scope of the authority granted to him by his mother, or whether Wickenkamp, who represented Judith Trackwell, had the authority to control Lloyd Trackwell Jr.'s conduct or was obligated to withdraw from representing Judith Trackwell when the conduct continued.  See Code of Professional Responsibility DR 2-110 (B)(1)(2000).  Wickenkamp's affidavit states, "On those occasions when Mr. Strotman asked me to tell Lloyd Trackwell not to come to his office or to the Defendant's premises I passed the information along in a timely fashion."  Filing 57, ex. 1 (Wickenkamp affidavit, ¶ 4.
   I further note that a factual dispute exists as to whether Dana Strandmo told Wickenkamp he was HomeServices of America, Inc.'s legal counsel with respect to the Trackwell dispute during his communications with Wickenkamp between August 4 and August 9, 2005.  Compare, filing 57, ex. 1 (Wickenkamp affidavit), ¶ 19 &

requested.  Under this court's local rules, "[a] party failing to request oral testimony consents to a submission of the motion without oral testimony.  No oral testimony will be permitted without the court's prior leave."  NECivR 7.1(e).

An evidentiary hearing on the sanctions issue is not only unnecessary, but under the current posture of this controversy, ill-advised.  The defendants' motion to release documents to the Counsel for Discipline implies that a complaint either has been or will be made against Wickenkamp based on her conduct in this and perhaps related cases.  Accordingly, the information filed in this case may also, in whole or in part, be the basis for a complaint filed against Wickenkamp before the disciplinary counsel.  The issue therefore arises as to whether this court's factual findings and conclusions on any disputed facts could prejudice or impact the independent review and investigation performed by the Counsel for Discipline.  Moreover, a complete resolution of the disputed factual issues raised by the motion would require a lengthy process of investigation and an evidentiary hearing.  This process would likely consume much time and money on the part of all concerned, could delay any proceedings before the Counsel for Discipline, and could potentially become its own lawsuit within a lawsuit.  I shall therefore resolve the sanctions issue raised by the defendants' motion on the basis of the undisputed material facts of record. I make no findings with respect to any other matters that have been raised by the motion to disqualify.

---

attachment B, and filing 45-5, ex. 8 (Strandmo affidavit), ¶¶ 3-5.  Since I have not relied on Wickenkamp's communications with Strandmo as a basis for awarding sanctions, I need not resolve this factual dispute.

6

The defendants request sanctions based on the court's inherent power to protect itself from practices which abuse or defile the "temple of justice." Chambers, 501 U.S. at 46. "Careful, case-specific consideration is owed therefore not only to the character of the sanctionable conduct, but also to the nature and purpose of the sanctions." United States v. Johnson, 327 F.3d 554, 562 (7th Cir. 2003). "An award of sanctions under the court's inherent power requires . . . a high degree of specificity in the factual findings of the lower courts." Revson v. Cinque & Cinque, P.C., 221 F.3d 71, 78 (2d Cir. 2000). See also Royal Ins. v. Lynnhaven Marine Boatel, Inc., 216 F.Supp. 2d 562, 567 (E.D.Va. 2002)(explaining that the court cannot sanction under its inherent power absent carefully scrutinizing counsel's conduct). A federal court cannot employ its inherent power to vindicate a party's actions in the absence of "bad faith," and cannot impose sanctions unless a specific finding of bad faith has been made. Roadway Exp., Inc. v. Piper, 447 U.S. 752, 767 (1980)("[T]he trial court did not make a specific finding as to whether counsel's conduct in this case constituted or was tantamount to bad faith, a finding that would have to precede any sanction under the court's inherent powers."). This high standard of proof, coupled with the convoluted nature of the facts presented for court review in this case, necessitates a detailed discussion of the undisputed evidence before determining whether Wickenkamp's conduct is sanctionable.

## STATEMENT OF FACTS

Though perhaps hard to recognize in its current state, the underlying basis of this lawsuit is the alleged breach of a contract to purchase real estate. The plaintiff claims B&J Partnership, Ltd. ("B&J") breached an agreement to buy property

owned by Judith Trackwell.  A. Joyce Smith and D. William Smith
are both managers for B&J; A. Joyce Smith is its registered agent
for service of process; Clay F. Smith is a B&J general partner;
and Michael C. Tavlin ("Tavlin") is the Chief Financial Officer
and in-house counsel for B&J.

The plaintiff's initial lawsuit has evolved through a series
of amendments to the plaintiff's complaint.  These amendments,
along with the plaintiff's proposed third amended complaint, have
served to expand the relevant historical time frame applicable to
this case, add several theories of recovery, and substantially
expand the number of allegedly responsible defendants.  Based on
the allegations of plaintiff's proposed third amended complaint,
filing 37, the relevant time frame applicable to this case now
extends back to at least 1998.

As more fully explained in the legal analysis to follow, the
distinction between pre-litigation conduct and conduct occurring
during the course of this litigation is relevant to determining
whether this court has any authority to sanction Wickenkamp and,
if so, the source of that authority and the applicable burden of
proof.  Accordingly, this statement of facts discusses:  1) the
underlying contract at issue; 2) the pre-litigation dispute and
conduct of the parties and their counsel; 3) the commencement of
federal litigation against B&J and the conduct of the parties and
counsel during the initial stages of this litigation; and 4) the
amendment of plaintiff's complaint to add HomeServices of
Nebraska, Inc., a subsidiary of HomeServices of America, Inc.,
and Capitol Title Company ("HomeServices defendants") as
defendants, and Wickenkamp's related conduct directed toward the
B&J defendants and their counsel, and the HomeServices defendants
and their counsel.

Historical facts that may have some bearing on the pending motion for sanctions, (such as prior lawsuits filed in this forum by Wickenkamp on behalf of the Trackwells, lawsuits filed in the Lancaster County District Court, and proposed allegations in this lawsuit dating back to 1999 regarding criminal charges pursued against Lloyd Trackwell Jr.), will be discussed as they become relevant to the allegedly sanctionable conduct.

I.    THE UNDERLYING CONTRACT.

On April 15, 2005, Lloyd Trackwell Jr., the plaintiff's son, and B&J executed an agreement for B&J's purchase of the "Trackwell Property" located at Southwest 27th and West A Streets in Lincoln, Lancaster County, Nebraska, except for that portion of the parcel subject to condemnation litigation filed by the City of Lincoln and pending in the District Court of Lancaster County, Nebraska.  The contract purchase price for the land was $2,050,000.  Filing 45-2, ex.1 (Tavlin declaration), ex. A.

Lloyd Trackwell Jr. signed the Trackwell/B&J purchase agreement "For Judith Trackwell and Lloyd Trackwell, Sr."  Filing 45-2, ex. 1 (Tavlin declaration), ex. A at p.3.  Neither Judith Trackwell nor her husband Lloyd Trackwell, Sr. ever signed the agreement.  Tavlin contacted Lloyd Trackwell Jr. on April 18, 2005 and requested an executed power of attorney confirming that Lloyd Trackwell Jr. was authorized to act on his parents' behalf in selling the property.  Tavlin was told to contact the Trackwells' counsel, Wickenkamp.  Filing 45-2, ex. 1 (Tavlin declaration), ¶ 4.  Wickenkamp has represented the Trackwells for many years and handles most of their legal work.  Filing 57, ex. 3 (Judith Trackwell affidavit), ¶ 3.

9

As instructed, Tavlin contacted Wickenkamp to obtain a
signed power of attorney.  Instead, B&J received an affidavit
signed by only Judith Trackwell "ratifying" Lloyd Trackwell Jr.'s
act of entering into the purchase agreement.  Filing 45-2, ex. 1
(Tavlin declaration), ¶ 4-5 & ex. B.

        II.   THE PRE-LITIGATION DISPUTE AND CONDUCT BETWEEN THE
              PARTIES AND THEIR COUNSEL.

The closing date for the sale was extended twice by
agreement of the parties, (filing 57, ex. 1 (Wickenkamp
affidavit), ¶ 7), but was ultimately set for July 15, 2005.
Filing 45-5, ex. 9 (LaDuke affidavit), ¶ 4 & attachment 3.
However, on July 12, 2005, two events occurred which jeopardized
this closing:  1) Capitol Title Company, the escrow agent and
title company for the closing, told Wickenkamp that in order to
obtain a title commitment and insurance, the property must first
be subdivided; and 2) B&J told Wickenkamp that based on further
studies of the property, purchasing the Trackwell property was
not economically feasible, and B&J therefore planned to delay or
cancel the closing.

Susan LaDuke, the Manager-Title Division of Capitol Title
received the proposed deed from Wickenkamp on July 12, 2005.
Filing 45-5, ex. 9 (LaDuke affidavit), ¶ 3(A) & attachment 2.
The proposed deed indicated the actual size of the Trackwell
property being sold.  After reviewing the proposed deed, LaDuke
asked James Lamphere, a licensed attorney and the president of
Capitol Title, whether the property needed to be subdivided.
Citing Lincoln City Ordinances as the basis for his conclusion,
Lamphere advised Wickenkamp that the property must be subdivided
to secure a title commitment and record the deed upon closing.

10

Filing 45-5, ex. 7 (Lamphere affidavit), ¶¶ 2-3 & ex. 1; filing 57, ex. 1 (Wickenkamp affidavit), ¶ 10(a).

On July 12, 2005 Wickenkamp also received an email from Tavlin on behalf of B&J.  The email stated that after expending several thousand dollars evaluating plans for the property, B&J concluded it was unable to "make the economics work or the opportunity work as the transaction is currently structured, and, as a result, we can not [sic] go forward with the closing as planned. . . . [T]he sellers will need to assume the full financial responsibility for . . . paving, as well as the water, sewer, and other utilities. . . ."  Filing 45-2, ex. 1 (Tavlin declaration), ¶ 6; filing 57, ex. 1 (Wickenkamp affidavit), attachment A.

Wickenkamp concluded that Capitol Title's claim that a subdivision was required, and B&J's simultaneous statement that it intended to breach the contract, were related events.  On July 13, 2005, Wickenkamp wrote Lamphere and LaDuke:

> I note that this 'subdivision' requirement did not come about until after Capitol Title became aware that B & J Partnership voiced an intent to breach the contract.
>
> . . .
>
> Mr. Lanphier [sic] it is clear to me that you have deliberately created obstacles in this transaction in order to aide B & J Partnership which is obviously a good client of yours.  This amounts to collusion with B & J Partnership which will NOT be tolerated.  Moreover, it is a breach of your contractual obligation subjecting you to suit.  It is also a basis for the State of Nebraska to inquire into Capitol Title's business practices.
>
> Either we proceed with the transaction and the title insurance policy is issued as set forth in the original

11

> commitment or Capitol title is going to be subject to
> suit.  Further be advised that any contacts you have
> had with any party related to B & J Partnerships are
> discoverable and will be disclosed in the lawsuit that
> occurs when these folks commit their planned breach.

Filing 45-5, ex. 7 (Lamphere affidavit), ex. 2.

Wickenkamp also disagreed that a subdivision was required,
explaining:

> Over the noon hour I took time to visit with various
> City and County officials who disagree with Mr.
> Lanpheir [sic].  The folks in planning and a review of
> the applicable City Ordinances make it clear that no
> subdivision requirement is applicable here.
>
> . . .
>
> The deed I have prepared accurately reflects this
> situation and the interests intended to be conveyed.
> Finally, I spoke with Julie Burns at the Lancaster
> County Register of Deeds at some length.  She assures
> me that the deed I have prepared can and will be filed
> if presented by Capitol Title.  She suggested you
> contact her if you have questions.

Filing 45-5, ex. 7 (Lamphere affidavit), ex. 2.  No one named
Julie Burns has ever worked for the Lancaster County Register of
Deeds.  Filing 45-5, ex. 10 (Agena affidavit), ¶ 4.  In response
to the pending motion, Wickenkamp acknowledges that she
incorrectly identified "Julie Burns" as her information source,
and states she probably spoke to Julia Peters, who is employed by
the Register of Deeds.  Filing 57, ex. 1 (Wickenkamp affidavit),
¶ 10(b).

Wickenkamp responded to B&J's statement of anticipatory
breach by directing Lloyd Trackwell Jr. to hand-deliver a letter
to Tavlin and A. Joyce Smith.  This letter, dated July 13, 2005,
stated that the closing must occur on July 15, 2005 because the

12

sale of the Trackwell land was part of a section 1031 exchange.[3]
Wickenkamp warned that if B&J did not proceed with the July 15,
2005 closing, suit would be filed against B&J in the United
States District Court for the District of Nebraska, and the
federal suit would not only allege a breach of contract claim,
but would also allege B&J violated Nebraska and federal antitrust
laws, specifically Neb. Rev. Stat. § 59-821 and 15 U.S.C. § 2
(the Sherman Act).  Wickenkamp claimed B&J was attempting to
monopolize the commercial real estate market in Lincoln,
Nebraska, and claimed the threatened federal court litigation
"has the potential to effectively eviscerate" B&J and its
holdings.  Wickenkamp explained that state and federal antitrust
statutes "provide for the dissolution of entities found to have
violated those laws and, where appropriate, forfeiture of
property."  Filing 45-2, ex. 1 (Tavlin declaration), ¶ 7 & ex. C.

    Tavlin sent Wickenkamp an e-mail at 9:00 a.m. on July 13,
2005 which stated the plaintiff could continue to speak directly
with Clay Smith regarding further business negotiations, but
"[w]ith regard to your legal threats, please direct all future
legal discussion and communications to our legal counsel, Mr.
Paul Conley. . . ."  Filing 45-2, ex. 1 (Tavlin declaration), ¶ 9
& ex. D.  See also filing 57, ex. 1 (Wickenkamp affidavit),
attachment C.  Apparently anticipating that legal action may
arise over the Trackwell property, B&J had contacted Conley on
July 12, 2005 and apprised him of the impending dispute.  Filing
45-3 (Conley declaration), ¶ 3.  Wickenkamp immediately responded
to Tavlin's email:

---

[3]Subject to statutory exceptions and provisions, 26 U.S.C. §
1031 allows a taxpayer to avoid capital gains taxation on the
sale of property exchanged for like-kind property.  This non-
taxable exchange must be completed within 180 days.

> [B]e advised that Mr. Conley has a conflict with this
> matter in that his office has handled matters relating
> to Mrs. Trackwell on a previous Section 1031 that
> resulted in a lawsuit.  At the time that representation
> occurred Mr. Conley was associated with Nancy Loftis
> and as a result of that matter Mr. Conley was in
> possession of privileged information relating to Mrs.
> Trackwell.  Under the Nebraska Rules of Professional
> Conduct Mr. Conley cannot represent B & J Partnership
> LTD in this matter.  We will seek to disqualify Mr.
> Conley from ANY involvement in this matter.  Why don't
> you give me the name of another lawyer to contact.
> [sic]

Filing 45-2, ex. 1 (Tavlin declaration), ex. D.

From July 13, 2005, when Wickenkamp was told Conley represented B&J, until Andrew Strotman became B&J's counsel on August 1, 2005, Wickenkamp continued to contact B&J representatives directly regarding Judith Trackwell's threatened and pending litigation.  Wickenkamp had apparently concluded that despite knowing B&J was represented, she had the right to bypass B&J's counsel based on her unilateral determination that Conley could never ethically represent any party adverse to Judith Trackwell.  Filing 57, ex. 1 (Wickenkamp affidavit), ¶¶ 11, 14-16.

Wickenkamp wrote a letter directly to A. Joyce Smith on July 14, 2005.  The letter stated the closing would go forward on July 15, 2005.  Filing 45-2, ex. 1 (Tavlin declaration), ¶ 10 & ex. E. However, the content of the letter was not limited to discussing the pending business transaction.  As to the plaintiff's continued threats of legal action, the letter stated:

> In the past few days we have seen further evidence that
> B & J Partnership Ltd appears to have entered this
> transaction with the deliberate intent to breach in an

attempt to keep the Trackwell's property off the market
at a critical time and to further disadvantage other
viable purchasers--all to the commercial benefit of B &
J Partnership, Ltd.  We will address B & J's conduct in
the marketplace as part of any lawsuit.

In the event that B & J Partnership LTD commits a
breach of its contractual obligation under the April
15, 2005 agreement be advised that, as stated in my
letter of July 13, 2005, Judith Trackwell will elect to
sue for damages.

<u>If Mrs. Trackwell is forced to forego the Section 1031
exchange we estimate the provable damages will range
from $7 to $10 million as a result</u>.

I have not spoken with Attorney Paul Conley as directed
in Mr. Michael Tavlin's email for the reason that Mr.
Conley cannot represent B & J Partnership Ltd. in <u>any
matter involving Judith Trackwell</u>.

Filing 45-2, ex. 1 (Tavlin declaration), ex. E (emphasis in
original).

During a July 14, 2005 meeting held between Wickenkamp,
LaDuke, and an underwriter for Chicago Title Insurance, the
obstacle to obtaining title insurance was removed when Chicago
Title agreed to issue insurance provided the subdivision issues
were excepted from the title commitment.  Filing 45-5, ex. 7
(Lamphere affidavit), ¶ 6; ex. 9 (LaDuke affidavit), ¶ 3(B) &
attachment 2.  The closing did not, however, occur.  The
Trackwells attended the closing on July 15, 2005, but B&J did not
participate.  Filing 45-5, ex. 7 (Lamphere affidavit), ¶ 7; ex. 9
(LaDuke affidavit), ¶ 5 & attachment 4.

On July 15, 2005, Wickenkamp again by-passed Conley and
contacted B&J directly.  At Wickenkamp's direction, Lloyd
Trackwell Jr. delivered a letter written by Wickenkamp to A.
Joyce Smith as registered agent for B&J.  Filing 45-2, ex. 1

(Tavlin declaration), ¶ 11 & ex. F.  The letter stated the
Trackwells had attended the closing and completed their
requirements for the property sale.  The letter formally demanded
B&J "to perform its contractual obligations.  Failure to do so by
the end of the business day on July 15, 2005 will result in
immediate litigation."  Filing 45-2, ex. 1 (Tavlin declaration),
ex. F.

III. THE COMMENCEMENT OF FEDERAL LITIGATION AGAINST B&J.

On July 18, 2005, Judith Trackwell filed her complaint in
this court against B&J, A. Joyce Smith, William D. Smith (later
corrected to D. William Smith), and Clay F. Smith.  See filing 1.
The initial complaint alleged claims for breach of contract,
tortious interference with a business relationship, and
violations of Nebraska and federal antitrust laws, specifically
Neb. Rev. Stat. § 59-821 and 15 U.S.C. § 2 (the Sherman Act).
See filing 1.  The suit and its antitrust allegations were
promptly reported in the Lincoln newspaper.  Filing 45-4, ex. 5
(Montag declaration), ex. M.

Lloyd Trackwell Jr. delivered copies of the summons and
complaint to B&J's offices, (filing 45-2, ex. 1 (Tavlin
declaration), ¶ 12), and he completed and signed returns of
service stating he personally served B&J, Clay F. Smith, A. Joyce
Smith, and William D. Smith.  These returns of service were filed
with the court on July 27, 2005.  See filings 4-7.

A.   The Conduct of the Parties and Counsel During the
     Initial Stages of Litigation Against B&J.

On July 18, 2005, after the complaints were served, Lloyd
Trackwell Jr. delivered two letters written by Wickenkamp to A.

16

Joyce Smith.  Filing 45-2, ex. 1 (Tavlin declaration), ¶ 12.  The
first letter accused A. Joyce Smith of avoiding Lloyd Trackwell
Jr.'s attempt to serve B&J with the complaint.  Filing 45-2, ex.
1 (Tavlin declaration), ex. G.  Wickenkamp stated she intended to
report Smith's refusal of service to the Nebraska Secretary of
State.  The letter reiterated Wickenkamp's belief that Conley
could not represent B&J and stated, "I will continue to
communicate with you as the Registered Agent until such time as I
am contacted by B&J's attorney."  Filing 45-2, ex. 1 (Tavlin
declaration), ¶ 12 & ex. G.  Though this case was now pending,
Wickenkamp did not seek--and has never sought--assistance from
this court in determining whether Conley was disqualified from
representing B&J under this court's ethics rules.  See NeGenR
1.8(d)(1).

    The second Wickenkamp letter delivered to A. Joyce Smith on
July 18, 2005 stated that B&J representatives had made
contradictory admissions against interest, and "I imagine a
United States District Court jury will find these mis-steps clear
evidence of bad faith on the part of B&J Partnership, LTD."
Filing 45-2, ex. 1 (Tavlin declaration), ¶ 13 & ex. H.  The
letter further warned that "ANY conveyances of property, real or
person [sic], from B & J Partnership, LTD to any other party in
an attempt to protect the assets of B & J will be fully
prosecuted under the Nebraska Fraudulent Conveyances statutes."
Filing 45-2, ex. 1 (Tavlin declaration), ex. H.

    On July 19, 2005 Wickenkamp wrote two additional letters to
A. Joyce Smith, (filing 45-2, ex. 1 (Tavlin declaration), ¶ 14),
and filed a disciplinary complaint against Conley with the
Nebraska Counsel for Discipline.  The first letter was a
settlement demand, (filing 45-2, ex. 1 (Tavlin declaration), ex.

17

I); the second advised that Wickenkamp was serving subpoenas on B&J, and warned that "any further attempts to refuse service will be reported to the Secretary of State."  Filing 45-2, ex. 1 (Tavlin declaration), ex. J.  Both letters closed with the following sentence:

> As indicated in earlier letters I will be happy to visit with any attorney B & J Partnership, Ltd. wishes to direct me to--other than Mr. Conoly [sic] due to his conflict.

Filing 45-2, ex. 1 (Tavlin declaration), exs. I & J.

Consistent with the position repeatedly stated in her letters, Wickenkamp's disciplinary complaint against Conley alleged Conley was representing B&J in a matter adverse to Judith Trackwell despite having a conflict of interest.  Wickenkamp claimed the conflict of interest arose because Conley office-shared with Nancy Loftis in 1998 when Loftis represented the Trackwells on a 1031 exchange regarding a different parcel of real estate.  Wickenkamp asserted that Loftis disclosed confidential information to Conley at that time concerning Judith Trackwell's financial condition and assets, and that armed with this information, Conley cannot now represent any party adverse to Trackwell.  See filing 57, ex. 1 (Wickenkamp affidavit), ¶¶ 11-16.  The disciplinary complaint was dismissed on August 23, 2005, and Wickenkamp was informed that her allegations did not warrant further inquiry.  Filing 45-3 (Conley declaration), ¶ 6 & ex. A.[4]

---

[4]The letter sent by the Counsel for Discipline to Wickenkamp explained:

> My review of the matter has not disclosed a conflict of interest by Attorney Conley.  Even if Mr. Conley

18

Wickenkamp sent a letter to A. Joyce Smith on July 21, 2005 stating that returns of service would be filed in the federal case; subpoenas to depose B&J personnel and a 30(b)(6) notice to depose B&J were issued in the Lancaster County District Court condemnation action; an amended federal complaint would be filed which included additional claims; the federal case would be dismissed if B&J paid the balance of the contract price by 5:00 p.m. on July 22, 2005; and the Trackwells would no longer negotiate direct with anyone from B&J.  Wickenkamp wrote, "We are convinced that any jury confronted with [the] facts will be outraged at the conduct of B & J Partnerships, LTD., and its principals and will punish it accordingly."  Filing 45-2, ex. 1 (Tavlin declaration), ¶ 15 & ex. K.  As to B&J's representation, Wickenkamp stated:

> I reiterate that I am willing to discuss this matter with any attorney representing B & J Partnership Ltd., except those with clear conflicts of interest - such as Paul Conley.  I do not communicate with Mr. Conley regarding this matter because I believe that in doing so I waive Mrs. Trackwell's objection to his involvement in this matter.  Mr. Conley has been reminded of the facts givig [sic] rise to the conflict.

Filing 45-2, ex. 1 (Tavlin declaration), ¶ 15 & ex. K.

--------

himself had represented Judith Trackwell on a prior matter, he could ethically represent a party with interests adverse to Ms. Trackwell in a subsequent matter as long as the cases were not the same or substantially related to each other.  There is no indication in the material you provided that the prior land transaction is related to the transaction presently in dispute.

Filing 45-3 (Conley declaration), ex. A.  Wickenkamp "respectfully disagree[s]" with this conclusion.  Filing 57, ex. 1 (Wickenkamp affidavit), ¶ 17.

19

B.   <u>The Plaintiff's First Amended Complaint</u>.

The plaintiff's first amended complaint was filed in this court on July 28, 2005.  Wickenkamp had earlier sent a letter to D. William Smith on July 22, 2005 demanding copies of The Smith Collection's application for tax exempt status and its tax returns for 2002 through 2004.  The Smith Collection is a nonprofit corporation which operates museums and conducts educational activities dedicated to preserving automotive history and the sport of racing.  Filing 45-2, ex. 1 (Tavlin declaration), ¶ 16 & ex. L.

The Smith Collection produced the requested information to Wickenkamp, (filing 45-2, ex. 1 (Tavlin declaration), ¶ 16), and this information apparently provided the basis for a new allegation against B&J.  The plaintiff's first amended complaint added an allegation that B & J unlawfully used "a nonprofit corporation with 501(c)(3) status and which is controlled by principals of B & J to offer fraudulent tax deductions as an inducement to others to engage in business transactions which are beneficial to B & J Partnership, Ltd."  Filing 8 (amended complaint), ¶ 12(c).  See also Filing 45-2, ex. 1 (Tavlin declaration), ex. N at p.2 (August 1, 2005 letter from Wickenkamp to Tavlin claiming B&J uses a nonprofit corporation "to create bogus tax deductions to facilitate business transactions").

IV.   THE PLAINTIFF'S SECOND AMENDED COMPLAINT:
      THE ADDITION OF HOMESERVICES OF NEBRASKA, INC.
      AND CAPITOL TITLE COMPANY AS NAMED DEFENDANTS.

On July 29, 2005 the plaintiff filed a second amended complaint naming HomeServices of Nebraska, Inc. and Capitol Title Company as additional defendants.  Filing 9.  The second

20

amended complaint alleges B&J was a frequent customer of
HomeServices of Nebraska, Inc., doing business as Capitol Title
Company, and that Capitol Title attempted to impose additional
title insurance requirements on the sale of the Trackwell land in
order to further B&J's unlawful goal of hindering or eliminating
the plaintiff's ability to deliver good title at closing.   The
second amended complaint alleges that these tortious acts of
HomeServices of Nebraska, Inc. and Capitol Title caused the
plaintiff to incur additional attorneys fees and costs, and
caused physical and emotional injuries.   Filing 9 (second amended
complaint), ¶¶ 12(d) & 16-20.

With the July 29, 2005 filing of the second amended
complaint, two sets of defendants are now parties to this case:
the B&J defendants and the HomeServices defendants.   From and
after August 1, 2005, the B&J defendants and the HomeServices
defendants had separate interactions with Wickenkamp.   The
defendants each seek recovery of sanctions for Wickenkamp's
alleged bad faith conduct.   That conduct will be separately
discussed and evaluated.

A.    Wickenkamp's Conduct Toward the B&J Defendants.

On August 1, 2005, Wickenkamp sent a letter to Tavlin
withdrawing all prior settlement offers and extending a new
demand for settlement of the federal case.   The letter stated:

> I write to you directly because of our earlier
> telephone conversation and the fact that as of this
> date I have not been contacted by any attorney on
> behalf of B & J Partnership, Ltd. and I have advised
> you that Attorney Paul Conley has a professional
> conflict in this case that prohibits him from
> representing B & J against Mrs. Trackwell on this
> matter.

21

Filing 45-2, ex. 1 (Tavlin declaration), ex. M at p.2.  The
letter threatened that unless B&J paid the contract price and the
plaintiff's compensatory damages (for a stated total of
$2,275,000) by noon on August 4, 2005, the plaintiff would file a
third amended complaint which added claims that B&J violated
federal RICO statutes.  Filing 45-2, ex. 1 (Tavlin declaration),
ex. M at p.2.

On August 1, 2005, B&J retained Cline, Williams, Wright,
Johnson, & Oldfather, L.L.P., and specifically Andrew Strotman of
that firm, to provide B&J's legal representation for the
Trackwell dispute.  B&J did not believe Conley had a conflict,
but it concluded that Wickenkamp's direct communications with
B&J, and especially with A. Joyce Smith, who is seventy years old
and has no legal background, would not cease until B&J hired new
counsel.  B&J also hired Cline, Williams because Wickenkamp had
filed an ethical complaint against Conley.  Filing 45-2, ex. 1,
ex. 1 (Tavlin declaration), ¶ 9.  See also pages 18-19 of this
Memorandum and Order, and footnote 4.

Wickenkamp was advised on August 1, 2005 that Cline,
Williams represented B&J, although there was some initial mis-
communication as to which attorney within that firm was working
on the B&J matter.  Filing 45-3, ex. 4 (Strotman declaration), ¶¶
2-3 & ex. A; filing 57, ex. 1 (Wickenkamp affidavit) ¶ 18.
Thereafter, Wickenkamp communicated with Strotman, B&J's new
counsel, rather than directly with B&J.

Before Strotman began representing B&J, Wickenkamp served
subpoenas to depose B&J and its representatives for the
condemnation suit pending in the District Court of Lancaster

County.  Filing 45-2, ex. 1 (Tavlin declaration), ¶ 17 & ex. M.
On May 18, 2004 the City of Lincoln, doing business as the
Lincoln Electric System ("LES"), had filed a "Petition for
Appointment of Appraisers and Condemnation of Lands" to condemn
6.36 acres of the Trackwell property located on Southwest 27th
and West A streets.  Filing 45-4, ex. 5 (Montag declaration), ex.
K.  Judith Trackwell, represented by Wickenkamp, appealed the
condemnation award to the Lancaster County District Court.
Filing 45-4, ex. 5, (Montag declaration), ex. L.  The plaintiff's
Petition on Appeal claimed the award entered by the Lancaster
County Board of Appraisers did "not represent the fair and
reasonable value of the real property" appropriated, the
Trackwells' severance damages, or the consequential damages the
Trackwells incurred as a result of the condemnation.  Filing 45-
4, ex. 5 (Montag declaration), ex. L, ¶ 3.  This appeal was still
pending when the plaintiff agreed to sell the Southwest 27th and
West A property to B&J.

The April 15, 2005 purchase agreement between Trackwell and
B&J specifically excepted out any land subject to the
condemnation proceedings.  However, when B&J did not close on the
property, Wickenkamp sent a letter to Tavlin stating she had
filed praecipes for issuance of subpoenas in the condemnation
action to depose Clay F. Smith, A. Joyce Smith, William D. Smith,
Tavlin, and a 30(b)(6) designee for B&J.  Filing 45-2, ex. 1
(Tavlin declaration), ex. K.  The subpoenas, served by the
Lancaster County Sheriff on July 26, 2005, required each witness
to appear for a deposition on August 10, 2005.  Filing 45-2, ex.
1 (Tavlin declaration), ¶ 17 & ex. M.

The Rule 30(b)(6) notice commanded B&J's corporate designee
to produce ten separate categories of documents and respond to

23

sixteen different areas of inquiry. However, although the issue
on appeal to the Lancaster County District Court was the 2004
value of the Trackwell's condemned land, and the value of any
severance or consequential damages, the 30(b)(6) notice sought
discovery unrelated to those issues. Instead, the notice
included discovery requests related to the pending disciplinary
complaint filed by Wickenkamp against Conley (and the plaintiff's
proposed third amended complaint),[5] the federal lawsuit by Judith
Trackwell against B&J as set forth in her initial and first
amended complaints herein,[6] the added claims against HomeServices

---

[5]The 30(b)(6) notice requested testimony concerning all
conversations between B&J and Nancy Loftis regarding the
Southwest 27th and West A property, Judith Trackwell's previously
owned properties, and her prior real estate transactions, id. at
p.6, ¶ 2(E). Wickenkamp's disciplinary complaint against Conley,
B&J's counsel, claimed Loftis provided confidential information
about Trackwell to Conley, and Conley was therefore disqualified
from representing B&J. See filing 57, ex. 1 (Wickenkamp
affidavit), ¶¶ 12-16. Trackwell's proposed third amended
complaint alleges Conley and Loftis assisted in an unlawful
scheme designed to hinder or eliminate Judith Trackwell's ability
to sell or develop her property. See filing 37, (proposed third
amended complaint), ¶ 34.

[6]The 30(b)(6) notice requested:

-- For the period beginning on April 15, 2005 to the present:

• All records of B&J's communications relating to the
  Trackwells, the Southwest 27th and West A property, or the
  adjacent property at Section 29, Township 10, Range 6,
  Filing 45-2, ex. 1 (Tavlin declaration), ex. M at p.4, ¶
  1(A);

• Any documents related to the April 2005 Trackwell/B&J
  purchase agreement, including B&J's communications with
  lending institutions, id. at p.4, ¶ 1(B)&(C); p.5, ¶
  1(G)&(H), & ¶ 2(B);

• B&J's internal communications concerning its decision not to
  perform on the Trackwell/B&J purchase agreement, and
  communications concerning resale of the Trackwell property;

24

and Capitol Title set forth in the plaintiff's second amended complaint,[7] and the extensive conspiracy allegations outlined in the plaintiff's proposed third amended complaint.[8]  The 30(b)(6)

---

    id. at p.4, ¶ 1(G); p.6, ¶ 2(I); and

- B&J's communications with construction contractors concerning its development of the Trackwell property; id. at p.5, ¶ 2(A)&(C).

-- Copies of:

- B&J's appraisals, plans, studies, and reports related to the Trackwell's Southwest 27th and West A property; id. at p.4, ¶ 1(D)&(E);

- Any contracts or offers to purchase that property, id. at p.4, ¶ 1(B)&(C); p.5, ¶ 1(I); and

- Records reflecting B&J's ownership in April 2005, the internal corporate structure of B&J, and its relationship with Speedway Motors, Inc., Blue Diamond Classics, Speedway Properties, and The Smith Collection; id. at p.4-5, ¶ 1(F); p.7, ¶ 2(O).

[7]The 30(b)(6) notice requested testimony of all conversations between B&J and Capitol Title regarding the Trackwells, the Trackwell property at Southwest 27th and West A, and any title commitment for selling that property, Filing 45-2, ex. 1 (Tavlin declaration), ex. M at p.6, ¶ 2(F).

[8]Generally speaking, the plaintiff's proposed third amended complaint alleges that the B&J defendants, the HomeServices defendants, and James Lamphere, Susan LaDuke, Chicago Title Company, Home Real Estate, Woods Brothers Real Estate, Robert Moline, and F. Ward Hoppe have conspired to defame the Trackwells, cause them economic harm, and eliminate their ability to sell the Trackwell property for a reasonable price or to obtain permits from the City of Lincoln and assistance from developers in developing the property.  Filing 37 (proposed third amended complaint).  See also filing 45-5, ex. 8 (Strandmo affidavit), ex. 2.  B&J's alleged motive was to gain an economic advantage in the development of its property located adjacent to the Trackwell property.  Filing 37 (proposed third amended complaint), ¶ 14.

discovery may also relate to federal lawsuits previously filed by Wickenkamp on the Trackwells' behalf against the City of Lincoln, Lancaster County, and others, including Robert Moline and F. Ward Hoppe. Because summons were never served on any defendant, these lawsuits were ultimately dismissed, either voluntarily in response to a show cause order, or for want of prosecution.[9]

---

The 30(b)(6) notice seeks the following:

-- From July 2001 to present, all communications between B&J and James Tieman, Hubert Hall, David Hall, Barry Fowler, Chris Kodad, or any other contractor, engineer, surveyor, or planning consultant regarding the Trackwell's Southwest 27th and West A property or the adjacent property at Section 29, Township 10, Range 6, or with FEMA or the Army Corp of Engineers regarding the Trackwell's Southwest 27th and West A property; Filing 45-2, ex. 1 (Tavlin declaration), ex. M at p.6-7, ¶ 2(J)-(N);

-- From July 2003 to present, all communications between B&J and Steve Henrichsen or any employee of the Lincoln-Lancaster County Planning Commission regarding the Trackwell's Southwest 27th and West A property or the adjacent property at Section 29, Township 10, Range 6, id. at p.6, ¶ 2(G) & (H);

-- From November 2004 to the present, all communications between B&J and John Nanos, or anyone at Woods Brothers Realty, id. at p.5, ¶ 2(D) & (D)[sic].

[9]In case numbers 4:04-cv-03397, Trackwell v. County of Lancaster, et. al, and 4:05-cv-03197, Trackwell v. Hoppe et al, the court entered orders to show cause why these cases should not be dismissed for want of prosecution, and in response, both were voluntarily dismissed. In both cases, Lloyd Trackwell Jr. alleged that F. Ward Hoppe, Robert Moline, and Randy King falsely accused him of theft by deception with respect to the 1998 sale of Trackwell property at 8301 West Van Dorn, and that they conspired with Alan Jacobsen, the prosecutor, and other members of the Lancaster County Attorney's office to maliciously prosecute Trackwell for the purpose of causing the Trackwell family economic harm and to acquire the Trackwell's property. Likewise, the plaintiff's proposed third amended complaint in this case alleges F. Ward Hoppe made false criminal allegations against Lloyd Trackwell Jr. intending to cause financial harm to the Trackwell family. Filing 37 (proposed third amended complaint), ¶ 11(a).

Strotman sent a letter to Wickenkamp on August 3, 2005 which addressed two primary concerns:  the scope of the deposition subpoenas served on B&J, and the RICO allegations against B&J as described in Wickenkamp's August 1, 2005 letter to Tavlin. Wickenkamp's August 1, 2005 letter to Tavlin warned:

> Assuming that B & J chooses not to accept the offer outlined above, be advised that at 1:00 p.m. Judith Trackwell will file a Third Amended Complaint in the pending federal court lawsuit.  This complaint will contain at least one additional cause of action under the federal RICO statute.  Civil RICO statutes will be used to address the long standing [sic] pattern of conduct by B & J that predates this transaction.  RICO requires allegations of predicate criminal acts.  We have sufficient evidence to allege RICO violations and conspiracy to commit RICO violations with predicate acts that include: extortion, money laundering, tax fraud, tax evasion, obstruction of justice, wire fraud and mail fraud.

Filing 45-2, ex. 1 (Tavlin declaration), ex. M at p.2. Wickenkamp claimed B&J's predicate criminal acts provided a basis for a civil RICO recovery that "could effectively put B & J . . . out of business."  Filing 45-2 (Tavlin declaration), ex. N at

---

Lloyd Trackwell Jr.'s complaint in 4:02-cv-03072, <u>Trackwell v. Jacobsen, et. al.</u>, alleged Alan Jacobsen had maliciously prosecuted Trackwell.  This case was dismissed for failing to serve any defendant.

The complaints in case numbers 4:03-cv-03368, <u>Trackwell v. City of Lincoln</u>, and 4:04-cv-03166, <u>Trackwell v. City of Lincoln</u>, were dismissed for want of prosecution.  The complaint in case 4:03-cv-03368 alleged Judith Trackwell had a constitutionally protected liberty and property interest in developing the Southwest 27th and A Street property and sought to enjoin the City's 2003 decision to condemn a portion of that property.  The complaint in 4:04-cv-03166 alleged the City's 2003 condemnation decision was made in retaliation for the Trackwells' 1999 suit against the City regarding ordinances for Airport Noise environs.

p.2.  After being told that Strotman now represented B&J, Wickenkamp sent a letter to Strotman on August 2, 2005, again stating that absent a settlement, the third amended complaint would be filed immediately.  Filing 45-3, ex. 4 (Strotman declaration), ex. C.

Addressing the deposition subpoena issues, Strotman's August 3, 2005 letter reminded Wickenkamp that the only disputed issue in the Lancaster County District Court case was the value of that small portion of the Trackwell's Southwest 27th and West A real estate that was condemned, and that the value was to be determined as of May 18, 2004, the date of the condemnation.  The letter stated, "your 30(b)(6) notice reveals an intention to ask questions and acquire documents for purposes well beyond the issues in the condemnation case."  The letter continued:

> You are taking these depositions for the improper purposes of harassing B&J and obtaining discovery in the federal suit.  Your threatening correspondence to B&J reveals the true motivation for the depositions. Your 30(b)(6) notice shows that your questioning will go beyond anything of relevance to the condemnation case.  Nebraska Discovery Rule 26(c) gives the district court broad discretion to curb such abuse.  Even if B&J did have information relevant to the condemnation case, you could obtain it with a single, narrowly tailored 30(b)(6) subpoena.  I again ask you to withdraw the current subpoenas and send me a new 30(b)(6) subpoena confined to the issue of the value of the parcel involved in the condemnation case.  Perhaps we could then agree on a limited production of documents and a deposition of limited scope.  If you insist on going forward with the current subpoenas, I will file for a protective order and request attorney fees.
>
> . . .
>
> I will file the motion for a protective order either late today or first thing tomorrow morning.  You have already told me, in writing, that you will not consider any modifications to your subpoenas.  Nonetheless, I still hope you will reconsider your position and opt

> for a more constructive approach, not only to the
> deposition issue, but to this matter as a whole.

Filing 45-3, ex. 4 (Strotman declaration), ex. D.

Concerning the plaintiff's substantive allegations of
alleged RICO violations, Strotman's August 3, 2005 letter
outlined B&J's position that allegations of conspiratorial,
antitrust, or criminal conduct were totally baseless.  Filing
45-3, ex. 4 (Strotman declaration), ¶ 6 & ex. D.  Strotman
further reminded Wickenkamp that pursuant to Rule 15 of the
Federal Rules of Civil Procedure, leave of the court was required
before a third amended complaint could be filed.  Filing 45-3,
ex. 4 (Strotman declaration), ¶ 6 & ex. D.

Wickenkamp did not promptly withdraw the deposition notices,
nor did she retract the RICO allegations.  Instead, on August 5,
2005, she faxed Strotman a rough draft of the plaintiff's third
amended complaint which included the plaintiff's RICO claim,
along with a cover letter that noted, "I have not yet received a
Motion to Quash the Subpoenas in the Trackwell/LES case.  If you
have one scheduled please advise at once or fax me a copy of the
motion."  Filing 45-3, ex. 4 (Strotman declaration), ex. E.

At 3:00 p.m. that afternoon Strotman faxed Wickenkamp a copy
of B&J's motion for protective order filed in the Lancaster
County District Court, along with a notice that the motion
hearing was scheduled for August 26, 2005.  Filing 45-3, ex. 4
(Strotman declaration), ex. F.  The letter accompanying the
motion and notice of hearing stated:

> Your Third Amended Complaint is ridiculous.  Before you
> file it you need to obtain leave of the Court and you
> ought to carefully review Rule 11.

29

. . .

> You are a material witness in the lawsuit you have
> filed.  Consider the number of allegations in your
> complaints--especially the drafted third amended
> complaint--about statements made by the defendants to
> Judith Trackwell's "representatives."  You had many
> relevant communications with both B&J and Capitol Title
> on the Trackwell real estate transaction.  You cannot
> act as a [sic] both a lawyer and a witness in this
> case.  Please disqualify yourself and find a new
> attorney for your client.

Filing 45-3, ex. 4 (Strotman declaration), ex. F.

On August 8, 2005 Wickenkamp sent a letter to Strotman outlining statements allegedly made by D. William Smith to Ron Doan on August 6, 2005.  D. William Smith allegedly stated that the defendants were "getting rid of" Trackwell's lawyer; no lawyer in Nebraska will represent the Trackwells; all the judges are the defendants' friends; the Trackwell land will never be developed because the City of Lincoln will oppose the Trackwells and no realtor or developer will touch the property; B&J will acquire it at a "fire sale" price; and Smith hoped Trackwell "goes home tonight and blows his brains out over this."  Filing 45-3, ex. 4 (Strotman declaration), ex. H.  These allegations were included in the proposed third amended complaint, and the affidavit of Lloyd Trackwell Jr. states the allegations are true.  Filing 37, (proposed third amended complaint) at ¶ 30; filing 57, ex. 2 (Lloyd Trackwell Jr. affidavit), ¶¶ 4-5.  However, Doan's affidavit disputes that these statements were ever made to him by D. William Smith, or that he ever told Lloyd Trackwell Jr. that such statements were made.  Filing 45-3, ex. 3 (Doan declaration), ¶¶ 4, 6-7.

The August 8, 2005 letter from Wickenkamp to Strotman continued:

> What disturbs me most is that these statements
> constitute admissions of an ongoing criminal conspiracy
> by your current client.  Be advised that I will take
> the position henceforth that <u>any act in furtherance of
> the conspiracy after this date will also be
> attributable to you and your firm</u>.

Filing 45-3, ex. 4 (Strotman declaration), ex. H (emphasis added).  The clear meaning of Wickenkamp's letter was that further representation of B&J by Cline, Williams (and Strotman), including the filing of any motion to disqualify Wickenkamp as a material witness concerning the allegations of the proposed third amended complaint, would be considered by Wickenkamp as part of B&J's alleged ongoing criminal conspiracy.

Strotman immediately responded:

> You need to recuse yourself from this lawsuit because
> you are a witness.  This has happened to you before in
> litigation involving Mr. Trackwell.  I raise the
> witness issue now only to give you fair notice and to
> attempt to resolve it without a motion.  Your response
> was a series of outlandish letters accusing my clients,
> my firm and me of criminal activity.  You are way
> across the line here--factually, legally and ethically.

Filing 45-3, ex. 4 (Strotman declaration), ex. J.[10]

---

[10]The statement, "This has happened to you before in litigation involving Mr. Trackwell," likely refers to Wickenkamp's withdrawal as counsel for Lloyd Trackwell Jr. on the theft by deception charges filed in the Lancaster County District Court in 1999.  See filing 45-4, ex. 5 (Montag declaration), exs. B-E (CR 99-1055 filings including filed Information and government witness list, defendant's witness list, Wickenkamp's motion to withdraw, and order of withdrawal); filing 57, ex. 1 (Wickenkamp affidavit), ¶ 20.  This charge involved the sale of real estate, including a mobile home located on the property, owned by Judith and Lloyd Trackell Sr. to Hub Hall in May 1998.  Wickenkamp negotiated the sale, and drafted and signed the purchase agreement on behalf of the Trackwells.  Lloyd Trackwell Jr. allegedly re-sold the mobile home to another buyer, stated he

On August 8, 2005 Wickenkamp withdrew the deposition notices, and in her letter to Strotman explained:

> I still believe that these matters are relevant to the LES [condemnation] case. . . . However, given that there are current allegations of ongoing criminal activity by your clients relative to this matter I have determined that under the Code of Professional Responsibility the appropriate course is to wait until we can take the depositions of our clients in the federal court case.  Quite frankly, I anticipate we are going to have individuals refusing to answer under the Fifth Amendment and I want to make sure the record is not muddled by the involvement of LES, nor the LES matter unduly affected by the B & J lawsuit.

Filing 45-3, ex. 4 (Strotman declaration), ex. K (emphasis added).

Wickenkamp filed the third amended complaint on August 8, 2005 without first obtaining leave of the court.  Filing 17.  The third amended complaint was stricken by court order on August 10, 2005.  Filing 21.[11]

---

owned the underlying real estate, and agreed to lease the land to the mobile home buyer at no charge.  See filing 45-4, ex. 5 (Montag declaration), exs. A & I.

In addition, Wickenkamp was a potential witness in Judith Trackwell's federal litigation against an appraisal company regarding its valuation of the Southwest 27th and West A property.  See 4:02-cv-03085, Trackwell v. D Johnson & Assoc, et al.  Based on the allegations of the complaint, Wickenkamp actively but unsuccessfully attempted to resolve a dispute with the defendant over discrepancies between the defendant's appraisals, and her actions and conduct formed a factual basis for the plaintiff's claim.  See 4:02-cv-03085, filing 34 (amended complaint), ¶¶ 12-16.  Wickenkamp was therefore a witness, and Judith Trackwell filed the lawsuit pro se.

[11]The plaintiff moved for leave to file a third amended complaint, (filing 18), but later moved to withdraw this motion and requested leave to file a corrected third amended complaint following the sale of the property at issue to another buyer.

B.   <u>Wickenkamp's Conduct Toward the HomeServices</u>
<u>Defendants</u>.

Though her August 8, 2005 letter implied that if Cline,
Williams continued to represent B&J, it may be named as a co-
conspirator with B&J, (filing 45-3, ex. 4 (Strotman declaration),
ex. H), the plaintiff's proposed third amended complaint does not
allege that Cline, Williams law firm assisted B&J in conspiring
against the Trackwells.  It does, however, allege that the law
firm of Hoppe & Harner, as well as Conley and Loftis, have
assisted in B&J's alleged unlawful scheme.  See filing 37
(proposed third amended complaint), ¶ 34.

On August 1, 2005 Wickenkamp sent a letter to F. Ward Hoppe,
who partners with Shannon Harner in the Hoppe & Harner law firm,
stating that due to Hoppe's prior attorney-client relationship
with Woods Brothers Realty, Hoppe had a conflict of interest and
could not represent Woods Brothers, HomeServices, or any of its
affiliated businesses.  Filing 45-5, ex. 6 (Harner affidavit), ¶
2 & ex. 1.  The letter to Hoppe stated:

> You in the past have represented Woods Brothers Realty.
> You have an ownership interest in a firm that attempted
> in 1998 to purchase the real property in question in
> the above referenced lawsuit.  In 1999 you initiated
> criminal charges against Lloyd Trackwell, Mrs.
> Trackwell's son, in a matter involving an employee of a
> company owned by Woods Brothers.  You also testified in
> that matter.
>
> It is clear that the 1999 criminal action initiated
> against her son was in fact an attempt by Woods

_____

Filing 30.  The motion to withdraw the prior motion and file a
corrected motion was granted.  The plaintiff's renewed motion to
file a third amended complaint was filed on October 19, 2005.
See filings 36 and 37.  The defendants' motion to disqualify was
filed on November 9, 2005.  Filing 43.

> Brothers Realty and persons associated therewith to
> cause the Trackwell family great legal expense forcing
> them to sell the S.W. 27th and West A Street property
> at a greatly reduced price.  You testified falsely in
> that criminal action that: 1) you were not a real
> estate developer; and 2) that you did not know Lloyd
> Trackwell, Jr.

Filing 45-5, ex. 6 (Harner affidavit), ex. 1.[12]  The letter also
stated Hoppe:  1) first met Lloyd Trackwell Jr. at a Christmas
party in 1990 and shortly thereafter discussed with him the
possible sale of the Van Dorn property; 2) attempted to develop
the West A property in 1995; 3) made an unusual trip with Randy
King in 1999 to the Trackwell's property at 8301 West Van Dorn to
"check out" King's purchase of two mobile homes; 4) within a year
of testifying against Trackwell, was involved in other real
estate projects; and 5) in 2001, bragged that Trackwell was
"going down."  The letter ended:

> Your previous actions, taken in conjunction with the
> actions of other employees of HomeServices of Nebraska
> companies and the actions of B & J Partnership, Ltd.
> show a clear pattern of activity targeting the
> Trackwell's [sic] and real property owned by them in an
> attempt to trigger a 'fire sale' of the development
> property.
>
> Be advised that we believe you will not only be a
> witness, but ultimately a party defendant.

Filing 45-5, ex. 6 (Harner affidavit), ex. 1.

On August 3, 2005, Wickenkamp contacted the Assistant
General Counsel for HomeServices of America, Inc., Mike Browne,
regarding the lawsuit.  Filing 45-5, ex. 6 (Harner affidavit),

---

[12]See also the similar allegations in case numbers
4:04-cv-03397, <u>Trackwell v. County of Lancaster, et. al</u>, and
4:05-cv-03197, <u>Trackwell v. Hoppe et al</u>, discussed previously in
footnote 9.

ex. 2 (Browne affidavit), ¶ 3.  HomeServices of America, Inc. is
named as an additional defendant in the plaintiff's proposed
third amended complaint.  Browne told Wickenkamp to direct all
future communications related to the impending lawsuit to the
Hoppe & Harner law firm.  Filing 45-5, ex. 6 (Harner affidavit),
ex. 2 (Browne affidavit), ¶ 4.  However, Wickenkamp continued to
directly contact Browne.  Filing 45-5, ex. 6 (Harner affidavit),
ex. 2 (Browne affidavit), ¶ 5.

On August 4, 2005 Wickenkamp contacted Dana Strandmo,
General Counsel for HomeServices of America, Inc.  Wickenkamp
stated she was "vetting" Omaha firms to assist her with "this
kind of case," and had someone "in the wings" in Omaha to step in
as co-counsel in representing the plaintiff.  Filing 45-5, ex. 8
(Strandmo affidavit), ¶¶ 4-5.  Wickenkamp told Strandmo that she
wanted to discuss settlement, but was unwilling to contact the
Hoppe & Harner law firm because they had a conflict of interest
in this case.  Filing 45-5, ex. 8 (Strandmo affidavit), ¶¶ 4-5.
Wickenkamp's August 5, 2005 letter to Strandmo stated:

> Ms. Harner is a law partner of Mr. Hoppe's and a
> potential witness in this case.  Mr. F. Ward Hoppe is
> named as a defendant and co-conspirator.  I believe
> that creates a conflict of interest that prevents Ms.
> Harner from representing HomeServices of Nebraska,
> Inc., Woods Brothers, Capitol Title or Home Realty.

Filing 45-5, ex. 8 (Strandmo affidavit), ex. 1.

Wickenkamp's letter further explained her intended legal
action against HomeServices of Nebraska as follows:

> B & J had in place a scheme wherein James Lamphere . .
> . would--at the last moment--step in to interfere with
> the purchaser's ability to procure title insurance.
> Lamphere was at all times herein also representing B &
> J and Clay Smith as an attorney in private practice.

35

> This was done with the knowledge and approval of
> HomeServices of Nebraska, Inc.
>
> . . .
>
> In this situation, Mr. Lamphere did not prevent the
> seller from being ready to perform--only because of
> extraordinary measures taken by my client.  I note that
> when we smelled a rat we objected vigorously.  <u>At no
> time during the transaction did James Lamphere or Susan
> LaDuke ever disclose the extreme conflict of interest
> or the fraud</u>.  It was only on or about July 27, 2005
> that Susan LaDuke, when confronted by Lloyd Trackwell,
> Jr., admitted that Lamphere was B & J's lawyer.
>
> I have been in touch with the Nebraska Department of
> Insurance but have not yet filed a formal complaint
> against Mr. Lamphere.  I note that we intend to take
> the position that Capitol Title, HomeServices of
> Nebraska, Inc. and Chicago Title Company are all
> <u>strictly liable</u> under Nebraska law for the acts of Mr.
> Lamphere and Ms. LaDuke.
>
> . . .
>
> My client is willing to accept $3,000,000 in complete
> settlement of her claim . . . and pursuant to any such
> settlement will dismiss all claims with prejudice
> against all parties.

Filing 45-5, ex. 8 (Strandmo affidavit), ex. 1 (emphasis in original).

Wickenkamp also sent a letter to Harner on August 5, 2005, forwarding a draft of the proposed third amended complaint and advising Harner to withdraw from representing HomeServices.  The letter stated:

> I write to request your immediate withdrawal from this
> matter.  Mr. Ward Hoppe is named as a party Defendant
> in the action and, as his partner, I believe his
> conflict of interest extends to you as well.  I believe
> this situation prevents either of you from representing
> HomeServices of Nebraska, Inc., Woods Brothers, Capitol
> Title or Home Realty.

> In addition I anticipate that you may be called as a
> witness in this case by virtue of your professional
> relationship with Mr. Hoppe and your prior appearance
> in U.S. Bankruptcy Court on behalf of Randy King.
> Certain acts taken in conjunction with the King case
> are being alleged as part of the conspiracy set forth
> in the pending case.

Filing 45-5, ex. 6 (Harner affidavit), ¶ 5 & ex. 3.  Randy King
was the alleged victim and a material witness in the 1999
criminal prosecution of Lloyd Trackwell Jr. for theft by
deception.  See filing 45-4, ex. 5 (Montag declaration), ex. A.[13]

Harner entered her appearance as counsel for HomeServices of
Nebraska, Inc. on August 8, 2005.  Filing 13.  Wickenkamp never
moved to disqualify Harner.

Wickenkamp contacted Strandmo several times on August 5, 8,
and 9.  According to Wickenkamp, Strandmo stated he represented
HomeServices of America, Inc. and engaged Wickenkamp in further
discussion about the lawsuit.  Filing 57, ex. 1 (Wickenkamp
affidavit), ¶ 19 & attachment B.  Wickenkamp sent a letter to
Strandmo on August 9, 2005 as a further attempt at settlement.
The letter began with a request that Strandmo not communicate
with Harner about the contents of the letter.

> I further ask that none of the information provided
> herein be disclosed to Shannon Harner.  I don't know
> Ms. Harner and there is nothing personal intended by
> this--but we believe her senior partner, F. Ward Hoppe,
> is involved in the conspiracy here and do not want
> certain information leaked to him.

-------------------

[13]See also footnote 10 and case numbers 4:04-cv-03397,
<u>Trackwell v. County of Lancaster, et. al</u>, and 4:05-cv-03197,
<u>Trackwell v. Hoppe et al</u>, discussed in footnote number 9.

Filing 45-5, ex. 8 (Strandmo affidavit), ex. 2.  Thereafter, the letter discussed Wickenkamp's legal theories and the basis for her allegations as set forth in the proposed third amended complaint.  Filing 45-5, ex. 8 (Strandmo affidavit), ex. 2.  See also filing 57, ex. 1 (Wickenkamp affidavit), ¶ 19.  Wickenkamp's communications with HomeServices of America, Inc. ceased when she realized it was not interested in settlement.  Filing 57, ex. 1 (Wickenkamp affidavit), ¶ 19.

The evidentiary record before me discloses no further interaction between the parties and their counsel since August 9, 2005.  The court's file reflects that the plaintiff moved to file her third amended complaint, filing 18, but this motion was denied as moot when she moved to file a modified third amended complaint to reflect that the land at issue was now sold to another buyer.  Filing 30.

The progression of this case was stayed pending resolution of the motion to disqualify and request for sanctions.  Filing 64.  The motion is now fully submitted for resolution.

LEGAL ANALYSIS

The dispute over plaintiff's representation arose when plaintiff's counsel filed a motion for leave to file a third amended complaint.  Defendants' motion asserts Ms. Wickenkamp cannot represent the plaintiff in this case because (a) she is a necessary witness, and (b) she has "engaged in a past pattern of bad faith and abusive misconduct in this and related litigation making disqualification in this case an appropriate sanction."  Filing 43.

38

The power of federal judges to impose sanctions in civil cases for abuses of process is broad and arises from several potential sources including:

1) Federal statutes, (see e.g. <u>Lee v. First Lenders Ins. Services, Inc.</u>, 236 F.3d 443, 445 (8th Cir. 2001) (holding sanctions warranted under 28 U.S.C. § 1927 where baseless class action claims were not abandoned by the plaintiff until after extensive discovery and motion practice had occurred));

2) The Federal Rules of Civil Procedure, (see e.g. <u>Chandler v. Norwest Bank Minnesota, Nat. Ass'n.</u>, 137 F.3d 1053, 1057 (8th Cir. 1998)(affirming district court's sanction under Rule 11 of the Federal Rules of Civil Procedure where plaintiff's counsel filed suit without conducting a reasonable inquiry into the law and the facts); <u>Lindstedt v. City of Granby</u>, 238 F.3d 933, 937 (8th Cir. 2000)(affirming dismissal as a sanction for flagrant abuses of the discovery process under Rule 37 of the Federal Rules of Civil Procedure));

3) The court's local rules, (see e.g. <u>Nick v. Morgan's Foods, Inc.</u>, 270 F.3d 590 (8th Cir. 2001)(holding the district court had authority under local rules to impose sanctions for failing to participate in good faith in alternative dispute resolution process); and

4) The inherent power of the court. <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 46 (1991)(holding that federal courts have the inherent power to compel payment of an opposing party's attorney's fees as a sanction for misconduct).  See also <u>United States v. Hudson</u>, 11 U.S. (7 Cranch) 32, 34 (1812)(noting that federal courts have the implied powers to fine for contempt, to imprison for contumacy or to enforce the observance of order, as they are "powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others"); <u>Stevenson v. Union Pacific R. Co.</u>, 354 F.3d 739, 750 (8th Cir. 2004)("Federal courts sitting in diversity can use their inherent power to assess attorney fees as a sanction for bad faith conduct. . . .").

"Because of the potency of inherent powers, '[a] court must exercise its inherent powers with restraint and discretion. . . .'" Baycol Steering Comm., 419 F.3d at 802.  Courts should ordinarily rely on the statutes and court rules rather than their inherent power, "[b]ut if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent powers." Chambers, 501 U.S. at 50.  "At the very least, the inherent power must continue to exist to fill in the interstices" not addressed by either the statutes or the rules.  Chambers, 501 U.S. at 50.

Therefore, when determining whether sanctionable conduct has occurred, the court should initially determine if sanctions are warranted under any federal statutes or court rules.  If sanctions are to be imposed, the court must identify the authority relied on in making this determination.  Fuqua Homes, Inc. v. Beattie, 388 F.3d 618, 623 (8th Cir. 2004).  Identifying the source of authority is critical, because while the statutes and rules may overlap to some extent when defining sanctionable conduct, they may also "sanction different kinds of actions, require the application of disparate standards of proof, permit the sanctioning of different persons, and differ in the procedures that the sanctioning court must follow." Fuqua Homes, 388 F.3d at 623.  In addition, the reach and application of the court's inherent power to sanction differs from that afforded under federal statutes and court rules.  Statutes and rules, "taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions. . . . [W]hereas each of the other mechanisms reaches only certain individuals or conduct, the inherent power extends to a full range of litigation abuses." Chambers, 501 U.S. at 46.

The defendants' motion and briefs do not cite to any federal statutes or rules authorizing the imposition of sanctions. The defendants rely solely on the court's inherent authority to sanction attorneys for unethical behavior or for conducting litigation in bad faith, citing Chambers, 501 U.S. at 43. Filing 44 (defendants' brief) at p.2. The court has, however, also considered whether any statutes or court rules exist which may be applicable to the allegations raised. As the following discusses, the court has specifically considered 28 U.S.C. §1927 and Rule 11 of the Federal Rules of Civil Procedure.[14]

A.   28 U.S.C. § 1927.

28 U.S.C. § 1927 states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. Section 1927 is penal in nature, and should be strictly construed so that it does not "dampen the legitimate zeal" of an attorney in representing her client. Lee v. L.B. Sales, Inc., 177 F.3d 714, 718 (8th Cir. 1999)(quoting Travelers

------

[14]A district court "is not bound by the parties' motions and may, in its sound discretion, impose sanctions *sua sponte* as long as it provides the attorney with notice regarding the sanctionable conduct and an opportunity to be heard. . . . This means that the court [can] properly take into account all of [Wickenkamp's] conduct in this case and calibrate sanctions accordingly." Jolly Group, Ltd. v. Medline Industries, Inc., 435 F.3d 717, 720 (7th Cir. 2006). See also Rule 11(c)(1)(B) (authorizing the court, on its own initiative, to enter an order requiring an attorney or party to show cause why it has not violated Rule 11(b)).

41

Ins. Co. v. St. Jude Hosp. of Kenner, La., Inc., 38 F.3d 1414, 1416 (5th Cir. 1994)).

"Sanctions are proper under § 1927 'when attorney conduct, viewed objectively, manifests either intentional or reckless disregard of the attorney's duties to the court.'"  Lee v. First Lenders, 236 F.3d at 445 (quoting Lee v. L.B. Sales, 177 F.3d at 718).  Sanctions may be imposed under § 1927 irrespective of the merits of the lawsuit.  Section 1927 "does not distinguish between winners and losers, or between plaintiffs and defendants. The statute is indifferent to the equities of a dispute and to the values advanced by the substantive law.  It is concerned only with limiting the abuse of court processes."  Roadway Exp., Inc. v. Piper, 447 U.S. 752, 762 (1980).

Section 1927 authorizes sanctions against the offending attorney, not the party, (see Kansas Public Employees Retirement System v. Reimer & Koger Associates, 165 F.3d 627 (8th Cir. 1999)), and only for conduct which "multiplies the proceedings." Accordingly, § 1927 applies only to unnecessary filings and tactics occurring after the lawsuit was initiated; it does not apply to the initial pleading filed or to attorney conduct occurring prior to filing suit.  In re Keegan Management Co., Securities Litigation, 78 F.3d 431, 435 (9th Cir. 1996).

Before imposing sanctions under § 1927, the court must determine whether a causal connection exists between the objectionable conduct of counsel and multiplication of the proceedings.  Lee v. First Lenders, 236 F.3d at 445 (quoting Peterson v. BMI Refractories, 124 F.3d 1386, 1396 (11th Cir. 1997)).  The sanctioning court must "make an effort to isolate the additional costs and fees incurred by reason of conduct that violated § 1927.  But the task is inherently difficult, and

42

precision is not required."   Lee v. First Lenders,  236 F.3d at
446.

     Applying the requirements of § 1927 to the facts of the
evidence before me, I conclude sanctions cannot be imposed
against Wickenkamp under 28 U.S.C. § 1927.  The relevant time
period under § 1927 began after the initial complaint was filed
on July 18, 2005 and runs until November 9, 2005, when the
defendants' motion to disqualify was filed, (see filing 43).
During that time frame Wickenkamp has filed an amended complaint,
(filing 8), a second amended complaint, (filing 9), a third
amended complaint, (filing 17, which was stricken by the court
*sua sponte*, (see filing 21)), a motion for leave to file the
third amended complaint and supporting brief, (filings 18 and
19); a motion for leave to withdraw the motion to amend and to
stay the proceedings pending the sale of the land, (filings 30
and 33), and her pending motion to file a third amended
complaint.  Filings 36 and 37.

     Accordingly, the conduct of Wickenkamp which may be
considered as multiplying these federal proceedings is her act of
filing, or attempting to file four distinct complaints, all
before any defendant has ever filed an answer.  The court does
not condone such conduct; however, on the record before me, I
cannot conclude that this conduct manifests intentional or
reckless disregard of the attorney's duties to the court in this
case.  Wickenkamp has not filed complaints that are, in all
material respects, identical to complaints that have already been
dismissed.  See Wages v. I.R.S., 915 F.2d 1230, 1235 (9th Cir.
1990)(holding § 1927 is violated when an attorney files an
amended complaint that is not materially different from a
previous complaint dismissed for failure to state a claim).

Whether the complaints state a claim or have merit has not yet
been addressed.

I also find no real causal connection between Wickenkamp's
conduct and any significant duplication of effort or investment
of time by the court and counsel.  The defendants have not been
required to answer any complaint, and their requests for
continuances, (filings 11, 14, 16, 24, 25, 27, and 38) have each
been promptly granted by the court without a hearing, and without
the necessity of a brief.  In other words, though Wickenkamp has
filed several complaints, in the context of the responsive
filings and court proceedings required by this conduct, she has
not thereby multiplied the proceedings to such a degree that
attorneys fees and costs should be awarded under § 1927.

B.   <u>Rule 11 of the Federal Rules of Civil Procedure</u>.

Rule 11 of the Federal Rules of Civil Procedure requires all
parties who file a complaint in federal court to ensure "that to
the best of the person's knowledge . . . formed after an inquiry
reasonable under the circumstances, . . . the claims . . . are
warranted by existing law or by a nonfrivolous argument for the
extension, modification, or reversal of existing law," and that
the "allegations and other factual contentions have evidentiary
support."  Fed. R. Civ. Proc. 11.  Rule 11 sanctions may be
imposed against not only an attorney, but a litigant who has
signed an abusive pleading or motion.  The primary purpose of
Rule 11 sanctions is to deter attorney and litigant misconduct.
<u>Kirk Capital Corp. v. Bailey</u>, 16 F.3d 1485, 1490 (8th Cir. 1994).

> Rule 11 requires that an attorney conduct a reasonable
> inquiry of the factual and legal basis for a claim
> before filing. . . .  To constitute a reasonable
> inquiry, the prefiling investigation must uncover a

> factual basis for the plaintiff's allegations, as well
> as a legal basis. . . .   Whether the attorney's inquiry
> is reasonable may depend on factors such as whether
> counsel had to rely on a client for factual
> information, or whether the attorney depended on
> forwarding counsel or another member of the bar. . . .
> The District Court must determine whether a reasonable
> and competent attorney would believe in the merit of an
> argument.

<u>Coonts v. Potts</u>, 316 F.3d 745, 753 (8th Cir. 2003)(internal
citations omitted).  However, it is the lawyer, not the lay
client, who must decide if claims are warranted by existing law
or by non-frivolous arguments for extending the existing law.
<u>Kirk</u>, 16 F.3d at 1492.  Under Rule 11(c), "[i]f . . . the court
determines that subdivision (b) has been violated, the court may
. . . impose an appropriate sanction . . . ."  F.R.Civ.P. 11(c).

     On the record currently before the court, the court does not
have authority under Rule 11 to impose sanctions on Wickenkamp.
Although the defendants have not raised Rule 11 as authority for
awarding sanctions, the court may, on its own initiative, enter
an order requiring an attorney to show cause why the attorney has
not violated Rule 11(b).  F.R.Civ.P. 11(c)(2).  However, even
assuming the record supported a conclusion that Wickenkamp
violated Rule 11(b)(1)) by filing pleadings for an "improper
purpose, such as to harass" the defendants, a violation of Rule
11(b)(1) alone does not justify imposing sanctions on the court's
own motion.  <u>MHC Inv. Co. v. Racom Corp</u>., 323 F.3d 620, 623 (8th
Cir. 2003)(quoting Fed.R.Civ.P. 11(b)(2)).  "Rule 11 sanctions
are imposed only in response to claims that are not 'warranted by
existing law or by a nonfrivolous argument for the extension,
modification, or reversal of existing law.'"  <u>MHC Inv.</u>, 323 F.3d
at 623 (quoting Fed.R.Civ.P. 11(b)(2)).  This standard is applied
with particular strictness when the court, on its own motion,
raises the issue of Rule 11 sanctions.  <u>MHC Inv.</u>, 323 F.3d at 623

(holding that the district court did not abuse its discretion when, on the court's own motion, Rule 11 sanctions were imposed because the record established that defendant's claims and defenses were not supported by the law, (F.R.Civ.P. 11(b)(2)), and were raised for the purpose of delaying judgment against the defendant (F.R.Civ.P. 11(b)(1))).

The scope of the parties' submissions, and accordingly the review employed by the court on this motion, has not extended to determining whether the pleadings signed by Wickenkamp present claims based on existing law or good faith extensions of the law. The record supports a conclusion that Wickenkamp used federal pleadings to threaten the defendants,[15] and this conduct was not isolated, but rather part of a pattern intended to convince B&J to close on the purchase or settle the dispute.  However, on the record before me I cannot conclude that Rule 11 authorizes

_____

[15]As to the B&J defendants, Wickenkamp warned that if the closing did not go forward, the federal court litigation she intended to file could "effectively eviscerate" B&J and its holdings, (filing 45-2, ex. 1 (Tavlin declaration), ¶ 7 & ex. C). After the litigation was filed, Wickenkamp demanded a settlement, accused B&J of criminal conduct, threatened that a civil RICO recovery "could effectively put B & J . . . out of business," (filing 45-2 (Tavlin declaration), ex. N at p.2), and stated "any jury confronted with [the] facts will be outraged at the conduct . . . and will punish B&J accordingly."  Filing 45-2, ex. 1 (Tavlin declaration), ¶ 15 & ex. K.

As to the HomeServices defendants, prior to the closing Wickenkamp warned that failing to resolve the title commitment issue before closing "amounts to collusion with B & J Partnership which will NOT be tolerated.  Moreover, it is a breach of your contractual obligation subjecting you to suit."  Filing 45-5, ex. 7 (Lamphere affidavit), ex. 2.  After filing suit and alleging the HomeServices defendants conspired with B&J, Wickenkamp stated her client was willing to accept $3,000,000 in complete settlement of the claim.  Filing 45-5, ex. 8 (Strandmo affidavit), ex. 1.  The original contract price was $2,050.00.

sanctioning Wickenkamp for filing pleadings and motions in this court.[16]

C.   <u>The Inherent Power of the Court</u>.

The court's inherent power to sanction is not limited by the confines of federal statutes or court rules.

> It has long been understood that certain implied powers must necessarily result to our Courts of justice from the nature of their institution, powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others. These powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.

<u>Baycol Steering Comm.</u>, 419 F.3d at 802 (quoting and relying on <u>Chambers</u>, 501 U.S. at 43)(internal quotation marks and citations omitted).

A federal court has the inherent power to impose sanctions against both litigants and attorneys who have acted in bad faith, vexatiously, wantonly, or for oppressive reasons. <u>United States v. Gonzalez-Lopez</u>, 403 F.3d 558, 564 (8th Cir. 2005). This inherent power assists the court in regulating its docket,

---

[16]Even were I to further investigate the merits of the claims raised and ultimately conclude Wickenkamp violated Rule 11(b)(2), I could not award the defendants their requested sanction of costs and attorney fees because the issue of sanctions under Rule 11 was raised by the court and not by motion of the parties. See <u>Norsyn, Inc. v. Desai</u>, 351 F.3d 825, 831 (8th Cir. 2003)(finding the district court abused its discretion in awarding a party its attorney fees and costs where Rule 11 was raised *sua sponte*). "Although Rule 11 places within the district court's arsenal the ability to award reasonable expenses and attorney fees, that sword may only be wielded upon the request of the opposing party." <u>Norsyn</u>, 351 F.3d at 831.

promoting judicial efficiency, and deterring frivolous filings,
(Roadway, 447 U.S. at 764-67), and authorizes it to supervise,
monitor and, when appropriate, discipline the conduct of
attorneys admitted to practice before the court.  Chambers, 501
U.S. at 43-46; In Re Attorney Discipline Matter, 98 F.3d 1082,
1087-88 (8th Cir. 1996).  The court's inherent power affords
district courts the autonomous authority to adopt and enforce
local rules for imposing disciplinary sanctions on members of its
bar.  In re Fletcher, 424 F.3d 783, 792 (8th Cir. 2005); In Re
Attorney Discipline Matter, 98 F.3d at 1087-88.

    The court's inherent power "reaches conduct both before and
during litigation as long as that conduct abuses the judicial
process in some manner," (Stevenson v. Union Pacific R. Co., 354
F.3d 739, 751 (8th Cir. 2004)), although the offending conduct
must have been practiced upon the court, and the award may not be
based solely on conduct that led to the substantive claim.  Lamb
Engineering & Const. Co. v. Nebraska Public Power Dist., 103 F.3d
1422, 1435 (8th Cir. 1997).  The court's inherent power to award
attorney fees pursuant to the bad faith exception is not
dependent on which party wins the lawsuit, or the underlying
merits of the parties' respective claims and defenses, but rather
on how the parties conduct themselves during the litigation.
Lamb Engineering, 103 F.3d at 1435.

    "[A] federal court's wide discretion as to whether to invoke
the inherent powers is tempered by its rather limited discretion
as to how it exercises them."  United States v. Johnson, 327 F.3d
554, 562-63 (7th Cir. 2003).  "[T]he district court's inherent
power to award attorney fees as a sanction for bad faith conduct
does not extend to pre-litigation conduct."  Lamb Engineering,
103 F.3d 1422, 1437 (8th Cir. 1997).  Any sanctions imposed can
apply only to acts which occurred in connection with the

48

proceedings in the trial court.  Lamb Engineering, 103 F.3d at 1437 (relying on Chambers, 501 U.S. at 55).  See also Horst Masonry Const., Inc. v. ProControls Corp., 2000 WL 268488, *1 (8th Cir. 2000)(unpublished)("Only defendants' post-litigation conduct, and not pre-litigation conduct, is relevant when awarding . . . attorneys' fees.").

I conclude Wickenkamp's challenged conduct falls within the "interstices" not addressed by either the federal statutes or the Federal Rules of Civil Procedure.  Chambers, 501 U.S. at 50.  For the reasons discussed below, I further conclude Wickenkamp has acted in bad faith and wantonly abused this court's processes for vindictive and oppressive reasons.

Wickenkamp's conduct evidences a pattern of directly contacting opposing parties even when she knew these parties were represented by counsel.  These numerous and on-going direct contacts occurred between July 13, 2005 and August 9, 2005.  See e.g. Filing 45-2, ex. 1 (Tavlin declaration), ¶¶ 11, 13, & 15, and exs. D-K, M-N; filing 45-5, ex. 6 (Harner affidavit), ¶ 5, ex. 2 (Browne affidavit), ¶ 5; and filing 57, ex. 1 (Wickenkamp affidavit), ¶ 11.  The contacts were not made with the consent of the lawyers representing the contacted party.  Nearly all of Wickenkamp's direct communications with represented parties discussed her intent to file suit against those parties.

This court's local rules for the relevant time frame provided:[17]

---

[17]The relevant Nebraska General Rules are those in effect on and after August 6, 2004, and before the December 9, 2005 amendments.

"Misconduct" Defined.  Acts or omissions by an attorney, acting individually or in concert with any other person or persons, which violate the Code of Professional Responsibility adopted by this court constitute misconduct and shall be grounds for discipline, whether or not the act or omission occurred in the course of an attorney/client relationship.

NEGenR 1.8(d)(3).


DR 7-104 of the Code of Professional Responsibility[18] states:

A)   During the course of his or her representation of a client, a lawyer shall not:

(1)   Communicate or cause another to communicate on the subject of the representation with a person the lawyer knows to be represented by a lawyer in that matter unless he or she has the prior consent of the lawyer representing such other person or is authorized by law to do so.

Code of Professional Responsibility DR 7-104(A)(1) (2000).


Ethical Consideration 7-18 provides:


The legal system in its broadest sense functions best when persons in need of legal advice or assistance are represented by their own counsel.  For this reason a lawyer should not communicate on the subject matter of the representation of his or her client with a person the lawyer knows to be represented in the matter by a lawyer, unless pursuant to law or rule of court or unless he or she has the consent of the lawyer for that person.

Code of Professional Responsibility EC 7-18 (2000).

---

[18]See http://court.nol.org/ethics/lawyers/index.htm Nebraska's Code of Professional Responsibility was applicable to conduct occurring prior to September 1, 2005.  The Nebraska Supreme Court adopted the Rules of Professional Conduct effective September 1, 2005.

Wickenkamp claims she refused to contact Conley, B&J's counsel, because Conley had a conflict of interest.  This argument lacks merit.  Conley allegedly obtained Judith Trackwell's confidential financial information in 1998 while he office-shared with Trackwell's counsel, Loftis.  Loftis represented Trackwell on a 1031 exchange of a different property.  Even assuming Conley and Loftis were partners, and assuming Conley did receive financial information related to Judith Trackwell, Wickenkamp cites no authority for prohibiting Conley from representing a party adverse to Judith Trackwell regarding a different matter seven years later.  As aptly stated by the Counsel for Discipline:

> My review of the matter has not disclosed a conflict of interest by Attorney Conley.  Even if Mr. Conley himself had represented Judith Trackwell on a prior matter, he could ethically represent a party with interests adverse to Ms. Trackwell in a subsequent matter as long as the cases were not the same or substantially related to each other.  There is no indication in the material you provided that the prior land transaction is related to the transaction presently in dispute.

Filing 45-3 (Conley declaration), ex. A.

Wickenkamp has also cited no authority granting her the right to unilaterally decide who has a conflict of interest and then, based on this decision, the further right to unilaterally determine that she is excused from complying with DR 7-104 of the Code of Professional Responsibility.  Wickenkamp filed a disciplinary complaint against Conley, but while awaiting the outcome, this case was pending.  At no time did she bring the matter to this court's attention for an independent review of whether Conley could ethically represent B&J.

51

Likewise, Wickenkamp claimed the Hoppe & Harner law firm could not represent the HomeServices defendants based on her personal assessment that F. Ward Hoppe was a witness and potentially a defendant.  Despite Wickenkamp's statements, Harner entered her appearance in this case on behalf of HomeServices of Nebraska.  Filing 12.  Wickenkamp has never moved to disqualify Harner based on any alleged conflict of interest, or asked the court to determine if Harner could represent the HomeServices defendants.

Wickenkamp's conduct effectively undermined B&J's ability to be represented by Conley, its initial counsel of choice and the attorney familiar with its business through long-term representation of its interests.  When it became apparent that Wickenkamp refused to comply with B&J's request that all contacts about litigation be directed to Conley, and when Conley was facing a disciplinary complaint filed by Wickenkamp for his representation of B&J, B&J retained new counsel.  Though B&J's current counsel is highly competent and is zealously representing B&J's interests, the fact remains that Wickenkamp's conduct unjustifiably interfered with the longstanding attorney-client relationship between B&J and Conley.

The need to seek new counsel as of August 1, 2005 was prompted in part by Wickenkamp's service of deposition subpoenas on B&J and its representatives, and in part by her escalating accusations leveled against B&J.  This lawsuit was filed on July 18, 2005.  Before any answer was filed, a scheduling order was entered, and any initial disclosures were served, Wickenkamp served discovery subpoenas issued by the District Court of Lancaster County seeking broad categories of information relevant to this federal litigation (and perhaps past federal suits

dismissed voluntarily or for want of prosecution), but not relevant to the state condemnation proceeding.

Rule 26 (d) of the Federal Rules of Civil Procedure provides:

> Except in categories of proceedings exempted from initial disclosure under Rule 26(a)(1)(E), or when authorized under these rules or by order or agreement of the parties, a party may not seek discovery from any source before the parties have conferred as required by Rule 26(f).

Wickenkamp's attempt to garner discovery responses in a state court action for use in this pending lawsuit represents a clear attempt to circumvent this court's discovery rules and processes. Moreover, the discovery requests were broad, harassing, and could best be described as a fishing expedition focused on attempting to entangle additional defendants and conspiracy allegations into this lawsuit.

The depositions were cancelled only after B&J's new counsel filed a motion for protective order.  Wickenkamp's stated reason for cancelling the depositions acknowledges that she knew the information sought related to the federal case.  Wickenkamp wrote, "I have determined that under the Code of Professional Responsibility the appropriate course is to wait until we can take the depositions of our clients in the federal court case." She further stated, "there are current allegations of ongoing criminal activity by your clients," and "[q]uite frankly, I anticipate we are going to have individuals refusing to answer under the Fifth Amendment. . . ."  Filing 45-3, ex. 4 (Strotman declaration), ex. K.

What began as a breach of contract claim was initially filed to include claims that B&J was monopolizing the commercial real estate market in Lincoln, Nebraska, which according to Wickenkamp, could ultimately "eviscerate" B&J.  Though the real estate contract price was $2,050,000, Wickenkamp threatened damage exposure ranging from seven to ten million dollars.  When B&J would not accede to her continuing settlement demands and threats, Wickenkamp obtained tax records from a non-profit organization operated by D. William Smith, and the plaintiff's complaint was amended thereafter to allege B&J was using the non-profit organization to commit tax fraud, thus also threatening the continued existence of that entity.  When B&J still refused to satisfy her settlement demands, Wickenkamp accused it of criminal conduct including extortion, money laundering, tax fraud, tax evasion, obstruction of justice, wire fraud, and mail fraud.[19]  The language of these contacts and demands was highly inflammatory, and delivered directly to B&J, not its retained counsel.

Ultimately, the HomeService defendants were drawn into this lawsuit with allegations that they participated as co-conspirators in B&J's scheme to hinder Judith Trackwell's sale and/or development of her property.[20]  The proposed third amended

_____

[19]Code of Professional Responsibility DR 7-105(A) states, "A lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter."  While Wickenkamp did not technically threaten "criminal charges" against B&J, the letter's demand for immediate settlement in lieu of facing a RICO claim certainly evinces an intent to gain an advantage in a civil case through allegations of criminal conduct.

[20]Before the closing, the title commitment issue was resolved.  Capitol Title conducted the closing, though B&J did not attend.  It is difficult to envision a basis for Wickenkamp's allegations that HomeServices is responsible for additional and unanticipated attorney fees and costs, or for physical and

54

complaint adds several more defendants allegedly responsible for the failed closing and Judith Trackwell's accompanying damages.

Wickenkamp's proposed third amended complaint alleges F. Ward Hoppe's role in the conspiracy dates back to 1999, when he testified against Lloyd Trackwell Jr. in a criminal trial, allegedly falsely making criminal allegations against Trackwell in order to financially harm the Trackwell family.  See filing 37 (proposed third amended complaint), ¶ 11(a).  Lloyd Trackwell Jr., represented by Wickenkamp, raised substantially the same allegations twice before in lawsuits filed in this court,[21] neither suit was served on any defendant, and both suits were voluntarily dismissed in response to a show cause order.  Unlike these prior suits, where F. Ward Hoppe's criminal allegations against Lloyd Trackwell Jr. were allegedly part of a scheme to maliciously prosecute Lloyd Trackwell Jr., Judith Trackwell's proposed third amended complaint now alleges Hoppe's 1999 criminal allegations were made to further the on-going scheme of Woods Brothers Real Estate, Home Real Estate, the HomeServices defendants and individual employees of these defendants, Chicago Title Company (which was prepared to issue the title insurance at the scheduled July 15, 2005 closing), and the B&J defendants to cause Judith Trackwell economic harm, force a "fire sale" of her property, and monopolize the commercial real estate market in Lincoln, Nebraska.

Wickenkamp threatened that any act in furtherance of B&J's alleged conspiracy would be attributable to its counsel, the Cline, Williams law firm and Strotman; the proposed third

emotional distress related to the title issue--a matter raised and resolved within two days.

[21]See footnote 9.

amended complaint specifically alleges that the Hoppe & Harner firm has assisted in B&J's conspiratorial scheme.  See filing 37 (proposed third amended complaint), ¶ 34.

Although Wickenkamp argues that her allegations were raised in good faith and that she has a duty to zealously represent her client, there are boundaries to zealous advocacy.  Ethical Consideration 7-10 provides:

> The duty of a lawyer to represent his or her client with zeal does not militate against the lawyer's concurrent obligation to treat with consideration all persons involved in the legal process and to avoid the infliction of needless harm.

Code of Professional Responsibility EC 7-10 (2000).

Without probing into whether the allegations raised by the pleadings filed have any merit beyond a breach of contract claim, the combined effect of Wickenkamp's conduct during, leading up to, and directly affecting this federal litigation establishes Wickenkamp acted in bad faith.  Wickenkamp refused to acknowledge Conley's representation of B&J, filed an unwarranted disciplinary complaint against him, made direct contacts with represented opposing parties, and ultimately forced B&J to retain new counsel.  Wickenkamp attempted to circumvent this court's discovery rules through the use of state court discovery proceedings.  She served multiple harassing, threatening, and accusatory demands on B&J representatives and HomeServices, and made continuously escalating settlement demands, ultimately incorporating her claim that B&J's alleged criminal acts justified the demands and supported a civil RICO recovery. Wickenkamp claimed HomeServices also could not be represented by its counsel of choice, the Hoppe & Harner law firm, yet never brought the issue to this court's attention for an independent

56

resolution.  She filed but failed to prosecute two lawsuits against F. Ward Hoppe alleging he falsely instigated criminal charges against Lloyd Trackwell, Jr. in 1999, and then she moved to amend the complaint in this case to raise these allegations again, this time on behalf of Judith Trackwell.

Wickenkamp's conduct represents an abuse of this court's processes, was conducted in bad faith, and is sanctionable under the court's inherent power.  Compensating the defendants for the costs and attorneys fees they incurred in filing the motion to disqualify is more than justified under the facts of this case. I shall therefore grant the defendants' request for sanctions.

IT THEREFORE HEREBY IS ORDERED:

1.  Defendants' motion for leave to Provide Copies of Sealed Filings to Counsel for Discipline, filing 76, is granted.  Copies may be provided to the office of the Counsel for Discipline; however, the clerk of this court and counsel in this case are ordered to keep all such documents under seal and not release any of them to any other person without prior court approval.

2.  The motion to disqualify counsel, filing 43, is granted in part and denied in part as follows:

   a.  That portion of the motion which seeks an order disqualifying Ms. Mary Wickenkamp from further representing this plaintiff in this case, is denied as moot.

   b.  That portion of the motion which seeks an order awarding defendants their reasonable expenses, including attorney fees, incurred in the filing of this motion, is granted, and such an award shall be made as against Ms. Wickenkamp only, and shall not in any way be taxed against the plaintiff, Judith Trackwell. Further:

      i.  Defendants are given twenty days from this date to file their application for expenses and fees;

      ii.  Ms. Wickenkamp is given twenty days from the filing of the application to file her response;

      iii. If either side desires a hearing on the application, request may be made in the application or the response, as applicable;

      iv.  The award made by this order shall NOT become a part of the eventual judgment in this case as between the parties; rather, it shall be transcribed and filed by the clerk in this court as a separate judgment against Mary Wickenkamp. The clerk shall also provide a copy of such judgment to the Counsel for Discipline of the Nebraska Supreme Court.

3.    The clerk of the court shall forward a copy of this Memorandum and Order to the Supreme Court Office of the Counsel for Discipline, 3803 Normal Boulevard, Lincoln, NE 68506.

4.    Given the sensitive nature of the matters discussed herein, and the fact that the same issues may be pending now or in the future before the Counsel for Discipline of the Nebraska Supreme Court, the undersigned respectfully requests that the parties and their counsel keep the opinions and orders set forth herein confidential until any appellate process on this order is concluded and any related complaint before the Counsel for Discipline is fully resolved. This request should not be interpreted as limiting in any way the full cooperation of the parties and counsel in any disciplinary investigation of this matter.

DATED March 30, 2006

                        BY THE COURT:

                        s/ *David L. Piester*

                        David L. Piester
                        United States Magistrate Judge